May it please the Court, my name is Vicki Dobrin and I represent the petitioner Mr. Heidery. I'd like to reserve two minutes for rebuttal. The government has recently withdrawn its jurisdictional challenge and I hope the court received that because I spoke with government counsel and he was not sure if the court received the withdrawal motion. And for that reason I don't plan to discuss that issue this morning unless the court has questions. Go right ahead. Okay. So I really just wanted to talk about the scope of the court's review and then discuss remedy. The board in its decision affirmed one aspect of the IJ's finding. That is it agreed that the record or Mr. Heidery failed to present sufficient evidence that as a Catholic he would more likely than not face persecution and torture in Afghanistan. And so that's really the only issue before the court. Does substantial evidence support that finding? The government argues that the court should review both the IJ's decision and the board's decision because the board added additional reasons. And that's clearly not accurate. The board didn't add any additional reasons, specifically declined to reach some of the issues in the case and focused or agreed solely with one finding of the judge. And so only that finding is before the court. Your client has two felony convictions? He does. And those were extant at the time of the IJ hearing? I'm sorry, they were. They existed at the time of the IJ hearing? They did. One was for grand theft auto, the other for controlled substance violation? That's correct. Why isn't that the end of the game, so to speak? Well, because as we argued in our brief and as the court seemed to recognize by asking the question, it's not the end of the game. It's not the end of the game. And so the court found that Mr. Hyderi was not removable as charged for those crimes. And therefore, he's not subject or the court doesn't lack jurisdiction under 1252A2C because there was no administrative finding that he was removable for any of the criminal grounds that the government alleged. She was for the passport violation that he was removed. That was all. Okay. And so. And let me ask again, just to understand the claim. Is the claim because he was Catholic and or simply because he was Muslim and then converted to Catholic? Well, that's part, that's actually part of the claim. And there's a whole other claim that the board didn't address at all. I mean, the record reflects and he testified that simply as a Catholic, his life is in danger. But it's particularly in danger because he's an apostate. And Afghanistan continues to follow Sharia law. There are over 100 Sharia courts in existence that are enforcing Sharia law. The Supreme Court justice has made clear that the courts will use Taliban-style punishments to enforce the law. And the expert witness that testified in this case is Mr. Stifton is the Afghanistan researcher for Human Rights Watch. And he testified that based on his knowledge of the current situation there, Mr. Hyderi, as an apostate, faces arrest, detention. He could be tried in a Sharia court and potentially executed. And for that reason, that testimony was uncontradicted. Nothing disputed that testimony. Now, the IJ decided that he wasn't persuaded by the testimony. And the only reasons he gave were, one, that the State Department religious freedom report referenced the ongoing Catholic and Christian congregation in Afghanistan. And the other reason was the IJ's opinion that since this government has invested billions of dollars into Afghanistan and has seen a lot of casualties in our own military, that, you know, Mr. Stifton's testimony should be rejected. And neither of those conclusions are really relevant. They don't contradict anything that Mr. Stifton said. And, in fact, the first reason that he relied on the reading of the State Department report is actually incorrect. The State Department report notes an existence of an extremely low-profile Christian community. And the report further notes that it had no ‑‑ it didn't have any record of the treatment of converts during the period of ‑‑ that the report covered. And so it's not in any way inconsistent. And as far as the amount of money or the troops that we have in Afghanistan, that's really not even in the record. And at best, it's just speculation and conjecture by the IJ in terms of how that affects an individual in Mr. Hyderi's situation. And so given the undisputed testimony of the expert witness, it's our position that no reasonable fact finder could fail to find that Mr. Hyderi met his burden with regard to statutory withholding and protection under the Convention Against Torture. And so the question is then, what's the appropriate remedy? And the board specifically declined to reach the question of whether Mr. Hyderi committed a serious nonpolitical crime outside of the United States. The immigration judge found correctly, in our view, that he had not. But the board decided not to reach it. And so under Ventura, the court cannot grant statutory withholding or relief under CAPT because it needs to remand to the board with instructions that it find that he's met his burden, but then address whether this statutory bar applies. And if it does apply, then the board should be instructed to grant him deferral of removal. In the alternative, if the court is not persuaded that the evidence reflects that simply as a Catholic who's converted, he's met his burden, the court would have to remand because the board did not address all of the evidence in the record. It didn't address all of the factors that he presented that place his life in danger. And under the regulations, implementing the Torture Convention, it's incumbent upon the board or the agency to discuss all evidence. And it clearly failed to do that. Well, when you say they have to discuss all evidence, but they reference the IJ's findings and conclusions, what does that statement mean? And I actually probably shouldn't have said discuss. I mean, consider. I mean, they should consider all of the evidence. And it's clear in their decision that they only considered whether Mr. Heider as a Catholic had met his burden. They did not discuss or adopt the IJ's conclusions with regard to the other factors. And in fact, the IJ himself really didn't make much, he really didn't discuss those factors either. And so even assuming that they affirmed his finding on, you know, the factors outside of religion, he really didn't make a finding. He didn't analyze those factors in a sufficient way. You have about two minutes and a half. Would you like to reserve that? Thank you for your argument. We'll hear from the government at this time. Mr. O'Connor. Good morning, Your Honors. May it please the Court, I am Blair O'Connor, representing the Attorney General in this matter. Your Honors, the government requires that this petition for review be denied because the record of evidence, the evidence of record does not compel the conclusion that petitioner would face a clear probability of person accusing or committing a crime. Now, initially, we'd like to note that the only issues before this Court are petitioner's eligibility for withholding of removal and protection under the Convention Against Torture. Because his application for asylum was number one, untimely, and also number two, statutory ineligible due to his criminal convictions, including two convictions of aggravated felony offenses, he was clearly not eligible for asylum. Therefore, the Court is only reviewing eligibility for withholding of removal and protection under CAT. On what basis did the BIA affirm? Yes, Your Honor. Actually, that's an important issue as well. The BIA's decision – I know it's important. Can you answer the question on what basis did they affirm? Yes. They affirmed the decision of the immigration judge citing to its own decision in a case called Matter of Burbano that holds that affirmance of a decision of an IJ in whole or apart is simply a statement that the Board's conclusions upon review of the record coincide with those of the IJ articulated in the IJ's decision. Therefore, the Board simply affirmed the immigration judge's decisions for the reasons stated in his decision. Now, it did go on and comment on one particular aspect of the IJ's decision, which was the claim whether or not there are Catholics in Afghanistan at the time of the hearing. But clearly, the decision just affirmed the IJ's conclusions for the reasons stated in his decision. That's what the case in Matter of Burbano – that's basically what it said. Therefore, in such a case, the government's position is that this Court would review both decisions, the Board's and the immigration judge's decision. Now, usually that's the contrary position that your agency takes. When an IJ has – there are problems with the IJ's report and the BIA takes – has a short summary of its reasoning, you say, well, you can't look at the error in the IJ. You only have to look at the BIA's decision. Your Honor, again, in my limited experience, my understanding is that we would only take that position in cases that don't cite to Burbano. Where, you know, the Board might say, you know, we've reviewed the record independently, and, you know, we agree with the IJ's decision. If they don't cite to Burbano, they go on and give reasons for their decision. Granted, that may be a short opinion, but it's clear that by not citing to Burbano that they've issued their own independent decision. My understanding – I've heard a Burbano argument from your agency, the very first time. I don't think anybody's ever taken this position before, at least in the many, many cases I've heard. And it may be it just has no risk. Everybody – So let me just make sure to understand. Your position is that they adopted not just the conclusion, but lock, stack, and barrel of the findings? Again, Burbano says they adopted either the conclusions in whole or in part. I was supposed to know what they did, if they don't cite that. By just citing Burbano, they're adopting some conclusions. But then they go on to make some, for them, fairly – at least at this stage, fairly substantial holdings. So how do we review? Do we review all of them to find error in any of them? Do we review just pick and choose? Again, Your Honor, that's why the Court would review both decisions. The board's and the immigration judge's. So if there's error in either of them, what do we do? Again, Your Honor, if you find that there's error in the immigration judge's decision and the Court is uncertain as to how the board treated that error, then it would have to be remanded. Okay. Again, the standard of review, because this is a withholding or removal case, is that the petitioner must demonstrate to this Court that the evidence compels the conclusion that he would face a clear probability of persecution or torture if returned to Afghanistan. With respect to his claim of religious persecution, the petitioner relied heavily on the testimony of his expert witness, Mr. Sifton, as well as various documents submitted that painted a bleak picture of the current situation in Afghanistan. The immigration judge appropriately gave Mr. Sifton's testimony a diminished weight because contrary to the petitioner's assertion, it was contradicted by the State Department reports and evidence. Even Mr. Sifton concluded, agreed in his testimony, that he could not definitively predict what would happen to a practicing Christian if returned to Afghanistan. When asked if he had any examples of Christians who were practicing in Afghanistan after the removal of the Taliban, he could not give any examples after 2001 when the Taliban was removed, but he primarily relied on the way that non-Muslims and Christians were treated during the reign of the Taliban. Now, the State Department report notes that there was a small, low-profile Christian community in Afghanistan at the time of the petitioner's asylum hearing, and it also noted that in the bond agreement, which came about in December of 2001, in the interim, Afghanistan basically adopted its 1964 constitution until a new constitution could be drafted. And under the 1964 constitution, non-Muslim citizens were free to perform their rituals within the limits determined by laws for public peace. Mr. Sifton indicated in his affidavit that the issue of secularism in the Afghani government and the place of non-Islamic Afghans in Afghanistan were not settled at the time of the petitioner's hearing. The State Department report notes that the constitution that was expected to be drafted would allow for religious freedom and religious tolerance of non-Muslim religions. Therefore, this record just simply does not compel the conclusion that as a Christian who continued to practice his Christian faith, if returned to Afghanistan, that he would clearly face a clear probability of persecution or torture. Now, with respect to the petitioner's remaining claims, he also claimed that he would suffer persecution because he had a cousin who was a member of the communist government way back in the 80s prior to the fall of Russia and the rise in power of the Taliban. Again, this is simply not a persuasive claim because the petitioner's cousin was merely an ambassador. He never served any – he was ambassador to various countries outside of Afghanistan. He never served in Afghanistan, was part of the communist government that may have been repressing Afghanis at the time. There is no evidence that he was involved in the repressive government, and he was not – he was currently not. He had been granted asylum in another country at the time of the hearing. So it's not persuasive that as a family member that Mr. Hadri would clearly be targeted as a member of the former government and persecuted for that reason. With respect to his claim, he also had a claim that because he had been westernized, he would clearly be singled out for persecution. Again, that was not persuasive. We would note that the president who was elected in free elections in October, Mr. Karrazi, has close associations in the United States, spent time in the United States, was closely associated with our Central Intelligence Agency throughout the 1980s, and is now the freely elected president. It's simply not a credible claim that he would face persecution on account of the fact that he has spent in western countries for the last several years. Finally, he had a claim that because he gave information regarding certain two Afghanis who were prosecuted by the Danish authorities for passport fraud, that he could therefore be persecuted on account of that if returned to Afghanistan. Again, that's not a credible claim. There is absolutely no evidence in the record that Mr. Hadri's identity as the source of the information used to prosecute those individuals was ever revealed to them. Both these individuals obtained fraudulent passports, passports for literally hundreds of Afghanis. There's no evidence that they would know that this individual was the one who turned them in for prosecution. Okay. I think we have your argument well in hand. Thank you for it. We'll hear a rebuttal at this time. I just wanted to again clarify that the additional reasons why Mr. Hadri is at risk really aren't before the court, because the board didn't adopt those findings. In citing Bourbano, that's really not helpful to the court. I mean, what the board said after it agreed with two of the IJ's findings was it said, after that on page three of the record, we agree with these findings. And so those were the findings that it agreed with. And with regard to whether the International Religious Freedom Report paints the picture that in the future religious freedom will be protected and talks about non-Muslims, Mr. Hadri is an apostate, and that's a distinguishing characteristic that places his life in severe danger because apostasy is punishable by death. And the Religious Freedom Report in no way contradicts that. Just in terms of those additional factors, even though they're not before the court, I mean, the record does support the conclusion that as a family member of somebody who was a high-ranking individual in the communist government, which he was, he testified that he was in the Department of Ministry, the record reflects that family members are routinely extorted and persecuted, and that happens today. And so it really just to go through each of those factors on their own really isn't the inquiry because we argued that it was all of those factors that placed his life in danger, not individually, though there's certainly an argument that each factor on its own would subject him to persecution. But again, the question is really does the record compel the conclusion that as an apostate and a practicing Catholic is his life in danger in Afghanistan? Does he face threats to his life and freedom and torture? And the testimony of the expert is undisputed. The government presented not a shred of evidence to contradict what he said. The judge, his reasons for discounting his testimony are not substantial at all. And so the court is left with the testimony of that expert, and it's consistent with the record, and it would have to find that Mr. Heider is men's burden. Thank you. Thank you. Thank both sides for their argument. They were helpful. The case just argued will be submitted for decision and will
judges: Hawkins, Thomas, McKeown